UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ADRIAN YAZZIE,                         )    NO. EDCV 08-668-CT
                                       )
            Plaintiff,                 )    OPINION AND ORDER
                                       )
      v.                               )
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of                        )
Social Security,                       )
                                       )
                                       )
            Defendant.                 )
                                       )
_____)

     For the reasons set forth below, it is ordered that judgment be
entered in favor of defendant Commissioner of Social Security ("the
Commissioner") because the Commissioner's decision is supported by
substantial evidence and is free from material legal error.

                         SUMMARY OF PROCEEDINGS

     On May 22, 2008, plaintiff, Adrian Yazzie ("plaintiff"), filed a
complaint seeking judicial review of the denial of benefits by the
Commissioner pursuant to the Social Security Act ("the Act"). On August
26, 2008, plaintiff filed a brief with points and authorities in support
of remand or reversal. On September 25, 2008, the Commissioner filed a

1  brief in response.

2

3                    SUMMARY OF ADMINISTRATIVE RECORD

4      1.   Proceedings

5      On   February   28,   2003,   plaintiff   filed   an   application   for

6  Supplemental   Security   Income   ("SSI")],   alleging   disability   since

7  December 30, 1967 due to depression, poor memory and poor concentration.

8  (TR  ).[1]  The application was denied initially and upon reconsideration.

9  (TR 52-59, 64-67).

10     On January 7, 2004, plaintiff filed a request for a hearing before

11 an administrative law judge ("ALJ").   (TR 68).   On February 23, 2006,

12 plaintiff, represented by an attorney, appeared and testified before an

13 ALJ.   (TR 566-98). The ALJ also considered vocational expert ("VE") and

14 medical expert ("ME") testimony].   On May 31, 2007, the ALJ issued a

15 decision that plaintiff was not disabled, as defined by the Act, and

16 thus was not eligible for benefits.   (TR 12-20).   On June 13, 2007,

17 plaintiff filed a request with the Social Security Appeals Council to

18 review the ALJ's decision.   (TR 8).   On March 25, 2008, the request was

19 denied.   (TR 5-7).   Accordingly, the ALJ's decision stands as the final

20 decision of the Commissioner.   Plaintiff subsequently sought judicial

21 review in this court.

22     2.   Summary Of The Evidence

23     The ALJ's decision is attached as an exhibit to this opinion and

24 order and materially summarizes the evidence in the case.

25

26     [1]   "TR" refers to the transcript of the record of
   administrative proceedings in this case and will be followed by
27 the relevant page number(s) of the transcript.

28                                   2

1 || <div style="text-align:center">PLAINTIFF'S CONTENTIONS</div>

2 Plaintiff essentially contends as follows:

3 1. The ALJ failed to properly consider plaintiff's testimony;

4 2. The ALJ failed to properly consider lay witness testimony;

5 3. The ALJ failed to develop the record regarding plaintiff's

6 treatment for depression;

7 4. The ALJ failed to properly consider a consultative psychological

8 evaluator's opinion;

9 5. The ALJ failed to consider the type, dosage, effectiveness, and

10 side effects of plaintiff's medication;

11 6. The ALJ failed to consider a state agency's psychiatrist's opinion;

12 7. The ALJ failed to consider plaintiff's depression a severe

13 impairment; and

14 8. The ALJ failed to pose a complete hypothetical question to the

15 vocational expert.

16 <div style="text-align:center">STANDARD OF REVIEW</div>

17 Under 42 U.S.C. §405(g), this court reviews the Commissioner's

18 decision to determine if: (1) the Commissioner's findings are supported

19 by substantial evidence; and, (2) the Commissioner used proper legal

20 standards. Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).

21 Substantial evidence means "more than a mere scintilla," Richardson v.

22 Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.

23 Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

24 When the evidence can reasonably support either affirming or

25 reversing the Commissioner's conclusion, however, the Court may not

26 substitute its judgment for that of the Commissioner. Flaten v.

27 Secretary of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir.

28 <div style="text-align:center">3</div>

1 | 1995).    The court has the authority to affirm, modify, or reverse the
2 | Commissioner's decision "with or without remanding the cause for
3 | rehearing."   42 U.S.C. §405(g).
4 |
5 |                          DISCUSSION
6 |     1.   The Sequential Evaluation

7 |     A person is "disabled" for the purpose of receiving social security
8 | benefits if he or she is unable to "engage in any substantial gainful
9 | activity by reason of any medically determinable physical or mental
10 | impairment which can be expected to result in death or which has lasted
11 | or can be expected to last for a continuous period of not less than 12
12 | months."   42 U.S.C. §423(d)(1)(A).

13 |     The Commissioner has established a five-step sequential evaluation
14 | for determining whether a person is disabled.   First, it is determined
15 | whether the person is engaged in "substantial gainful activity."   If so,
16 | benefits are denied.

17 |     Second, if the person is not so engaged, it is determined whether
18 | the person has a medically severe impairment or combination of
19 | impairments.   If the person does not have a severe impairment or
20 | combination of impairments, benefits are denied.

21 |     Third, if the person has a severe impairment, it is determined
22 | whether the impairment meets or equals one of a number of "listed
23 | impairments." If the impairment meets or equals a "listed impairment,"
24 | the person is conclusively presumed to be disabled.

25 |     Fourth, if the impairment does not meet or equal a "listed
26 | impairment," it is determined whether the impairment prevents the person
27 | from performing past relevant work.   If the person can perform past
28 |                                    4

1 relevant work, benefits are denied.

2      Fifth, if the person cannot perform past relevant work, the burden
3 shifts to the Commissioner to show that the person is able to perform
4 other kinds of work.   The person is entitled to benefits only if the
5 person is unable to perform other work.   20 C.F.R. §§ 404.1520, 416.920;
6 Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

7      2.   Issues

8           A.   Plaintiff's Credibility

9      Plaintiff   contends   the   ALJ   erred   in   assessing   plaintiff's
10 credibility.   According to plaintiff, the ALJ's decision to reject
11 plaintiff's credibility was an arbitrary one that is unsupported by the
12 record.

13      An ALJ need not believe every allegation of disabling pain.   See
14 Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).   Where, however, an
15 ALJ finds a plaintiff's claims of disabling pain not entirely credible,
16 and there is no evidence of malingering, the ALJ must set forth legally
17 permissible, specific, and clear and convincing reasons for doing so.
18 See Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993) ("If there is
19 medical evidence establishing an objective basis for some degree of pain
20 and related symptoms, and no evidence affirmatively suggesting that the
21 claimant was malingering, the [Commissioner's] reason for rejecting the
22 claimant's testimony must be 'clear and convincing,' and supported by
23 specific findings") (citations omitted).

24      An ALJ may reject a plaintiff's credibility based on internal
25 conflicts in a plaintiff's statements or testimony.   See Light v. Social
26 Security Administration, 119 F.3d 789, 792 (9th Cir. 1997) (in weighing
27 plaintiff's credibility, ALJ may consider "inconsistencies either in

28                                        5

1  [plaintiff's] testimony or between his testimony and his conduct");

2  see also Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989) (ALJ can

3  reject pain testimony based on contradictions in plaintiff's testimony).

4  Conflicting testimony concerning alcohol use can contribute to an

5  adverse credibility finding.   Verduzco v. Apfel, 188 F.3d 1087, 1089

6  (9th Cir. 1999) (finding applicant's testimony not credible where there

7  was evidence of malingering and where the testimony and "various

8  statements regarding his drinking were not consistent").   However, an

9  isolated line of testimony that suggests some equivocation about alcohol

10  use cannot, without more, suffice to reject a plaintiff's credibility.

11  See Robbins v. Commissioner, 466 F.3d 880, 884 (2006).

12  Here, the ALJ noted that plaintiff made several inconsistent

13  statements regarding plaintiff's drug and alcohol use.   (TR at 17-18).

14  For example, in the course of one consultative examination, plaintiff

15  initially denied using alcohol for over two months, then admitted to

16  using it alcohol a month before the exam, and then admitted that he used

17  alcohol everyday and that his alcohol intake was limited only by the

18  financial resources available to him.   (Id. at 459).   Moreover,

19  plaintiff provided evasive responses about his use of both alcohol and

20  drugs.   (Id.).   This evasiveness appeared to be deliberate.   (Id.).   And

21  although plaintiff told another examining physician that plaintiff used

22  alcohol to help him sleep, notes from a treatment facility where

23  plaintiff participates show that plaintiff disregards the terms of his

24  parole and spends any available money on drugs and alcohol.   (Id. at

25  492).   This was corroborated by Isaac Mullen, a lay witness called by

26  plaintiff.   Mullen testified that plaintiff had a tendency to run away

27  from the treatment facility once he was paid and spend all of his money

28                                    6

1  on alcohol.  (Id. at 592).

2      Plaintiff made similar inconsistent statements about his drug use.
3  For example, he consistently told medical examiners that he had never
4  used drugs (see, e.g., TR at 380, 459, 522), but medical records showed
5  that he, in fact, did use drugs, including amphetamines.  (Id. at 459).
6  Likewise, notes from the treatment facility where petitioner is housed
7  show that he has a "long history of  leaving the supervision of staff to
8  attain and secure drugs and alcohol."  (Id. at 492).

9      Furthermore, as noted by the ALJ, plaintiff engages in daily
10  activities that betray his claims of being disabled.  "With respect to
11  daily activities, [the Ninth Circuit] has held that if a [plaintiff] 'is
12  able to spend a substantial part of [his] day engaged in pursuits
13  involving the performance of physical functions that are transferable to
14  a work setting, a specific finding as to this fact may be sufficient to
15  discredit a claimant's allegations.'"  Vertigan v. Halter, 260 F.3d
16  1044, 1049 (9th Cir. 2001) (emphasis in original) (citing Morgan, 169
17  F.3d at 600); see also Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).
18  In Fair, however, the Ninth Circuit cautioned that "many home activities
19  are not easily transferable to what may be the more grueling environment
20  of the workplace, where it might be impossible to periodically rest or
21  take medication."  Fair, 885 F.2d at 603.

22      Here, although the ALJ cited some activities that arguably are not
23  transferable to a workplace setting, the ALJ nevertheless cited the fact
24  that plaintiff works five days a week for four hours a hour.  (TR at 15,
25  18; see also id. at 577-78).  While this does not constitute substantial
26  gainful activity, it does undermine plaintiff's  assertions that he is
27  incapable of working.  Plaintiff, however, notes that he often misses

28                                    7

1 work, sometimes as often as three to five days a month.   While the
2 record supports this, the record contains no evidence suggesting that
3 plaintiff's "haphazard job attendance" has anything to do with his
4 mental impairment.   Rather, as stated by lay witness Mullen, plaintiff
5 sometimes is "just not around."   (TR at 591).

6    Accordingly, the ALJ did not materially err in finding that
7 plaintiff lacked credibility.

8

9       B.   Lay Witness Testimony

10    Plaintiff contends that the ALJ failed to properly consider the
11 testimony of Isaac Mullen.   Specifically, plaintiff faults the ALJ
12 failing to consider's Mullen's testimony that plaintiff often misses
13 three to five days of work a month and that plaintiff is often absent
14 without leave from the treatment center where he stays.

15    "[D]escriptions by friends and family members in a position to
16 observe [plaintiff's] symptoms and daily activities have routinely been
17 treated as competent evidence."   Sprague v. Bowen, 812 F.2d 1226, 1232
18 (9th Cir. 1987); see also Crane v. Shalala, 76 F.3d 251, 254 (1996).
19 The ALJ may not discount witness reports solely because they were
20 procured by plaintiff.   Crane, 76 F.3d at 254 (citing Ratto v.
21 Secretary, Dept. of Health & Human Servs., 839 F. Supp. 1415, 1426 (D.
22 Or. 1993)).   Rather, if the ALJ wishes to discount the testimony of a
23 lay witness, the ALJ must give reasons that are germane to that witness.
24 Crane, 76 F.3d at 254 (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th
25 Cir. 1993)).

26    Here, the ALJ committed no material error in assessing the
27 testimony of Mullen.   First, contrary to plaintiff's assertions, the ALJ

28                                    8

1  specifically discussed plaintiff's habit of missing work. (TR at 15).
2  Indeed, the ALJ noted that plaintiff has a "haphazard job attendance and
3  is often AWOL from the group home where he lives." (Id.). But more
4  importantly, Mullen's testimony was not beneficial, but detrimental to
5  plaintiff. For example, as discussed above, Mullen did not attribute
6  plaintiff's haphazard job attendance to any mental or physical
7  impairment. (See supra). And to the extent that Mullen offered an
8  opinion about plaintiff being absent without leave, Mullen suggested
9  that it was due to plaintiff's steady abuse of alcohol. (TR at 592).
10 This is confirmed by plaintiff's treatment records. (TR at 492; see
11 supra).

12     In short, the ALJ did materially err in assessing Mullen's
13 testimony. Moreover, assuming without deciding that the ALJ erred, that
14 error was harmless because Mullen's testimony was damaging to
15 plaintiff's application.

16

17          C.    Development of the Record

18     Plaintiff contends that the ALJ did not properly develop the
19 record. Specifically, plaintiff faults the ALJ for failing to obtain
20 records allegedly chronicling some counseling for depression that
21 plaintiff received at the Soboba Indian Tribe. Additionally, plaintiff
22 faults the ALJ for failing to obtain evidence regarding plaintiff's use
23 of Wellbutrin to treat plaintiff's depression.

24     "In Social Security cases the ALJ has a special duty to fully and
25 fairly develop the record and to assure that [plaintiff's] interests are
26 considered." Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)
27 (citing Thompson v. Schweiker, 665 F.2d 936, 941 (9th Cir. 1982)); see

28                                    9

*also* Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  This duty exists even when the plaintiff is represented by counsel.  Brown, 713 F.2d at 443.

"Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'"  Tonapetyan, 242 F.3d at 1150 (citing Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)).  The ALJ may discharge this duty in several ways, including:  (1) subpoenaing plaintiff's physicians; (2) submitting questions to plaintiff's physicians; (3) continuing the hearing; or, (4) keeping the record open after the hearing to allow for supplementation of the record.  Id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998); Smolen, 80 F.3d at 1288)).

Here, the ALJ's development of the record was sufficient.  Although the record lacks information about the counseling plaintiff received at the Soboba Indian Tribe Clinic, the psychologists who personally examined plaintiff noted that plaintiff had sought counseling and considered plaintiff's allegations of depression.  (See TR at 251, 380, 455).  Moreover, the examining psychologists did, in fact, review medical records regarding plaintiff's alleged depression.  (See, e.g., TR at 521).

Likewise, there was no material error in regards to developing the record about plaintiff's use of Wellbutrin.  Although plaintiff faults the ALJ for failing to consider plaintiff's use of Wellbutrin, this fact was noted by Dr. Taylor.  (See TR at 521).  Furthermore, plaintiff was inconsistent about his use of Wellbutrin.  Indeed, Dr. Taylor noted that plaintiff initially denied taking any medications, but then recanted and

1   stated that he was taking Wellbutrin.[2]   (TR at 524).   And notably,
2   plaintiff never mentioned talking Wellbutrin to at least two examining
3   psychologists.

4       Regardless, the examining psychologists found plaintiff capable of
5   performing tasks commensurate with the ALJ's ultimate finding regarding
6   plaintiff's residual functional capacity.   As noted by the examining
7   psychologists, plaintiff's problems stemmed not from depression, but
8   from alcohol abuse.   (See TR at 384, 463, 524; see also infra).   As
9   such, there is no reason to believe that the lack of either plaintiff's
10  counseling records or information regarding plaintiff's possible
11  Wellbutrin use in any way hampered the ALJ's ability to access
12  plaintiff's medical conditions.

13      Accordingly, the court finds that the ALJ did not fail to
14  adequately develop the record.

15
16              D.   Psychological Evaluator's Opinion

17      Plaintiff contends that the ALJ erred in assessing the medical
18  opinion of Dr. Clifford Taylor, one of the examining psychological
19  evaluators in this case.   Specifically, plaintiff asserts that the ALJ
20  failed to discuss some specific aspects of Dr. Taylor's opinion in which
21  Dr. Taylor discussed a few particular aspects of plaintiff's behavior,
22  mood, and attention span.   The failure to discuss these particulars of
23  Dr. Taylor's opinion, according to plaintiff, shows that the ALJ either
24  selectively evaluated Dr. Clifford's opinion or implicitly rejected Dr.
25  Taylor's opinion.   As discussed below, the ALJ committed no material

26

27      [2] Plaintiff brought no medications with him to the
    consultative examination.   (TR at 524).

28                                    11

1  error in assessing Dr. Clifford's opinion.

2      The opinion of an examining physician is entitled to greater weight
3  than that of a non-examining physician. Lester v. Chater, 81 F.3d 821,
4  830 (9th Cir. 1996). As with a treating physician, the Commissioner
5  must present "clear and convincing" reasons for rejecting the
6  uncontroverted opinion of an examining physician and may reject the
7  controverted opinion of an examining physician only for "specific and
8  legitimate reasons that are supported by substantial evidence." Id. at
9  830-31. It is error for an ALJ to neither explicitly reject the opinion
10 of an examining physician nor set forth specific, legitimate reasons for
11 crediting a non-examining medical advisor over an examining physician.
12 Nguyen v. Chater, 100 F.3d 1462 (9th Cir. 1996).

13     Here, despite plaintiff's characterizations of the ALJ's
14 assessment, the record shows that the ALJ not only accepted Dr.
15 Clifford's opinion, but that the ALJ strongly relied upon that opinion
16 in finding that plaintiff was not disabled. (TR at 17-18). In his
17 decision, the ALJ accurately set forth a summary of Dr. Clifford's
18 findings regarding plaintiff's intellectual functioning, his ability to
19 pay attention and concentrate, his memory, his ability to follow and
20 understand directions, his level of functioning in social and
21 occupational settings, and other findings pertinent to plaintiff's
22 residual functional capacity. (TR at 17-18). Having done so, the ALJ
23 was not required to set forth every fact underlying those findings.
24 Indeed, even if the ALJ had set forth every underlying fact, this would
25 not change the ultimate findings that Dr. Taylor made regarding either
26 plaintiff's medical conditions or his residual functional capacity. On
27 the contrary, Dr. Taylor's ultimate findings encompassed the underlying

28                                    12

facts and findings contained throughout the six-page written evaluation of plaintiff's medical conditions and his residual functional capacity. (TR at 520-25).

In short, the ALJ accurately summarized Dr. Taylor's opinion inasmuch as it was relevant to plaintiff's medical conditions and ability to work. The ALJ, therefore, did not materially err in this regard.

## E.   Type, Dosage, and Side Effects of Plaintiff's Medications

Plaintiff argues that the ALJ failed to properly consider the type, dosage, effectiveness, and side effects of plaintiff's medications.

An ALJ must consider all factors that might have a significant impact on an individual's ability to work, including the side effects of medication. Erickson v. Shalala, 9 F.3d 813, 817-18 (9th Cir. 1993). When a plainiff testifies about experiencing a known side effect associated with a particular medication, the ALJ may disregard the testimony only if he "support[s] that decision with specific findings similar to those required for excess pain testimony." Varney v. Sec'y of Health and Human Servs., 846 F.2d 581, 585(9th Cir. 1988), modified by, 859 F.2d 1396 (9th Cir. 1988). Moreover, side effects not "severe enough to affect [plaintiff's] ability to work" are properly excluded from consideration. Osenbrock v. Apfel, 240 F.3d 1157, 1164 (9th Cir. 2001). Ultimately, a plaintiff bears the burden of demonstrating that his use of medications caused a disabling impairment. See Miller v. Heckler, 770 F.2d 845, 849 (9th Cir. 1985)(plaintiff failed to meet

1  burden of proving medication impaired his ability to work because he
2  produced no clinical evidence).

3      Here, the ALJ did not err in failing to consider the type, dosage,
4  and alleged side effects of plaintiff's medications.  Although the
5  record shows that plaintiff most likely took some medication, the record
6  lacks any evidence suggesting that plaintiff suffered any side effects
7  from taking those medications, let alone side effects severe enough to
8  impact his ability to work.  Indeed, during a June 19, 2006 psychiatric
9  evaluation, plaintiff informed the evaluating psychiatrist that
10 plaintiff was not taking any psychiatric medications.  (TR at 458).  He
11 did the same at a February 7, 2007 evaluation, but then reported he was
12 taking Wellbutrin.[3]  (TR at 524).  But at no point did he indicate that
13 he suffers disabling side effects from the medication that he may or may
14 not have been taking.

15     In short, plaintiff never met his burden to show how his use of
16 medications impaired his ability to work. As such, the ALJ committed no
17 material error in considering either plaintiff's use of medications or
18 the purported effects of those medications.

19

20              F.   State Agency Psychiatrist's Opinion

21     Plaintiff contends that the ALJ failed to properly consider the
22 opinion of the state agency psychologist.  Specifically, plaintiff
23 asserts that the ALJ failed to consider several moderate limitations

24

25     [3] During a third psychological evaluation, plaintiff never
   mentioned taking Wellbutrin, but instead stated that he was
26 taking Paxil.  (TR at 384).  At still another point, plaintiff
   stated that he had been taking Paxil, but that he had stopped
27 using it because he believed he no longer needed it in light of
   the fact that his depression had largely subsided.  (TR at 458).

28
                                14

that the state agency psychologist assessed regarding plaintiff's
functional abilities.

The state agency psychologist assessed the following moderate
limitations on plaintiff's functional abilities: (1) the ability to
understand and remember detailed instructions; (2) the ability to carry
out detailed instructions; (3) the ability to maintain attention and
concentration for extended periods; (4) the ability to perform
activities with a schedule, maintain regular attendance, and be punctual
within customary tolerances; (5) the ability to sustain an ordinary
routine without special supervision; (6) the ability to work in
coordination with or proximity to others without being distracted by
them; and (7) the ability to interact appropriately with the general
public.   (TR at 403-04).

With these limitations in mind, the state agency psychologist
concluded that plaintiff could sustain simple repetitive tasks with
adequate pace and persistence and that plaintiff could adapt and relate
to coworkers and supervisors, but could not work with the public.   (Id.
at 405).   Citing on this assessment, the ALJ concluded that plaintiff
could "perform simple repetitive tasks in a non-public environment."
(TR at 19).   As explained below, the ALJ committed no material error in
so concluding.

State agency medical consultants are "highly qualified physicians"
who are also "experts in Social Security disability evaluation."   20
C.F.R. §§ 404.1527(f)(2), 416.927(f)(2). Nevertheless, an ALJ is not
bound by an examining medical expert's opinion and may reject such an
opinion.   Gallant, 753 F.2d 1450, 1454 (9th Cir. 1984).   But where no
evidence contradicts the examining physician's opinion, the ALJ must

1  provide "clear and convincing" reasons to reject the opinion. <u>See</u>
2  <u>Lester v. Chater</u>, 81 F.3d at 830 ("As is the case with the opinion of a
3  treating physician, the Commissioner must provide 'clear and convincing'
4  reasons for rejecting the uncontradicted opinion of an examining
5  physician.")   Even if medical evidence in the record contradicts the
6  examining physician's opinion, the ALJ must still provide "specific and
7  legitimate" reasons to reject his opinion. <u>Id.</u>; <u>see</u> <u>also</u> <u>Andrews</u>, 53
8  F.3d at 1042.

9      Here, the ALJ did not err in assessing the state agency
10  psychologist's opinion.   First, contrary to plaintiff's suggestion, the
11  ALJ did not reject the state agency psychologist's opinion; rather, the
12  ALJ explicitly agreed with and adopted the resulting conclusions.   Thus,
13  the ALJ could not have erred in "rejecting" the state agency
14  psychologist's opinion.

15      Second, that the ALJ did not recite each of the moderate
16  limitations assessed by the state agency psychologist is of no
17  consequence.   The moderate limitations assessed by the state agency
18  psychologist deal by and large with plaintiff's ability to understand
19  and carry out complex instructions and interact with the public.   But
20  the state agency psychologist's ultimate conclusion accounted for these
21  limitations, as well as the other moderate limitations that were
22  assessed.   (<u>See</u> TR at 403-04).   Indeed, the state agency psychologist
23  concluded (and the ALJ ultimately found) that could perform simple,
24  repetitive tasks and could not work with the public.   (<u>Id.</u> at 129, 304).
25  And in any event, all of the limitations that plaintiff faults the ALJ
26  for neglecting to consider were set forth by the ALJ in his summary of
27  Dr. Taylor's opinion.   (<u>See</u> <u>id.</u> at 17-18) (noting, among other things,

28                                        16

that plaintiff had moderate difficulty in social and occupational setting, as well as moderate impairments in ability to interact appropriately with supervisors, co-workers, and the public).

In sum, the ALJ was aware of plaintiff's moderate limitations. And because the state agency psychologist's conclusions necessarily encompassed those limitations, the ALJ committed no material error in agreeing with the state agency psychologist's ultimate conclusions regarding plaintiff's ability to work.

### G.   Non-Severe Impairment

Plaintiff contends that the ALJ failed to consider plaintiff's depression as a severe impairment, despite evidence suggesting that plaintiff suffered from depression. Proper consideration of the impact of this depression, according to plaintiff, would have had "significant ramifications" on plaintiff's ability to work.

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 416.920(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 416.921(b); Bowen v. Yuckert, 482 U.S. at 141-42. An impairment will be considered nonsevere when medical evidence establish only a "slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically

17

1  considered."   Social Security Ruling 85-28; <u>Bowen v. Yuckert</u>, 482 U.S.
2  at 154 n.12.

3      Here, the ALJ did not err in regards to assessing plaintiff's
4  purported depression.   First, as discussed earlier, several examining
5  psychologists considered plaintiff's allegations of depression. Despite
6  this and despite some medical records regarding depression, none of the
7  examining psychologists found that plaintiff suffered from depression.
8  Moreover, as noted earlier, plaintiff informed an examining psychologist
9  that he had stopped taking his prescribed depression medication because
10 he no longer believed it necessary, as his depression had largely
11 subsided.   (TR at 458).   Consequently, the medical evidence did not
12 support plaintiff's allegations regarding depression.

13     Second, even if the court assumes without deciding that plaintiff's
14 purported depression was a severe impairment, plaintiff would not be
15 entitled to social security benefits because the medical evidence shows
16 that plaintiff's alcohol use was a contributing factor to any such
17 disability.   Title 42, United States Code, Section 423(d)(2)(C) provides
18 that "[an individual shall not be considered to be disabled . . . if
19 alcoholism or drug addiction would . . . be a contributing factor
20 material to the Commissioner's determination that the individual is
21 disabled."   <u>See</u> <u>also</u> 20 C.F.R. § 404.1535(a).

22     In determining whether drug addiction or alcoholism is "a
23 contributing factor material to the determination, a key consideration
24 is whether the individual would still be found disabled if he stopped
25 using alcohol or drugs.   20 C.F.R. § 404.1535(b)(1); <u>see</u> <u>also</u> <u>Sousa v.</u>
26 <u>Callahan</u>, 143 F.3d 1240, 1245 (9th Cir. 1998).   In making this
27 determination, the Commissioner will evaluate which of the plaintiff's

28
                                    18

1 current physical and mental limitations would remain if the plaintiff
2 stopped using drugs or alcohol and then determine whether any or all of
3 the plaintiff's remaining limitations would be disabling.  20 C.F.R. §
4 404.1535(b)(2).  See id.

5     Here, the ALJ found that plaintiff's alcoholism was a key
6 contributing factor to plaintiff's mental impairments.  (See TR at 18).
7 This finding is amply supported by the medical and lay evidence in the
8 record.  For example, the examining psychologists all noted plaintiff's
9 alcohol abuse and found that plaintiff's limitations were due in large
10 measure to that abuse.  (See, e.g., TR at 384 ("The patient's
11 psychiatric prognosis is fair as long as he abstains from alcohol.");
12 id. at 463 (noting that mood disorder is likely caused by alcohol and
13 that plaintiff is likely to improve if he abstains from alcohol use);
14 id. at 524 (noting persistent alcohol abuse and stating that a "strong
15 case can be made for alcohol effects on cognitive deficits, which could
16 be associated with long-term alcohol abuse")).

17     In sum, the ALJ did not materially err in finding that the medical
18 evidence was insufficient to suggest that plaintiff's alleged depression
19 constituted a severe impairment.  Moreover, assuming without deciding
20 that an error occurred, the error was harmless in light of the fact that
21 alcohol was a contributing factor to any mental limitation under which
22 plaintiff labored.

23

24       H.   Vocational Expert Hypothetical

25     Plaintiff contends the ALJ erred in failing to give a complete
26 hypothetical to the vocational expert ("VE").  Specifically, plaintiff
27 contends that the ALJ's hypothetical failed to account for (1) lay

28

witness Mullen's testimony that plaintiff often missed three to five days of work per month (supra), (2) the moderate limitations assessed by the state agency psychologist (supra), (3) and the functional limitations described by Dr. Taylor (supra).

The assumptions contained in an ALJ's hypothetical to a VE must be supported by the record; otherwise, the opinion of the VE that the plaintiff has residual working capacity has no evidentiary value. Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993); Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Hypothetical questions posed to the VE must set out all of the plaintiff's limitations and restrictions. Embrey v. Bowen, 849 F.2d at 422.  The hypothetical question must be "accurate, detailed and supported by the medical record." Osenbrock v. Apfel, 240 F.3d 1157, 1165 (9th Cir. 2001) (citing Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999)).  If limitations based on subjective complaints are not included in a hypothetical, the ALJ must make specific findings explaining the rationale for disbelieving any of the subjective complaints not included.    See  Light v. Social Security Administration, 119 F.3d 789, 793 (9th Cir. 1997).

Here, the ALJ did not pose an incomplete hypothetical.  Each of the purported deficiencies in the ALJ's hypothetical assumes that the ALJ erred in assessing either the lay witness testimony or the medical evidence set forth in the state agency psychologist's opinion or in Dr. Taylor's opinion.  However, as explained in the preceding sections, the ALJ committed no such error.  Moreover, the hypothetical that the ALJ posed to the vocational expert accounted for the functional limitations set forth in both Dr. Taylor's opinion and in the state agency psychologist's opinion.  (See supra).  As to the lay testimony regarding

plaintiff's haphazard job attendance, no evidence suggests that this was due to any of plaintiff's purported mental impairments. Rather, to the extent that lay witness Mullen offered an opinion about plaintiff's unsteady attendance record, Mullen suggested that it was due to plaintiff's steady abuse of alcohol. (See supra; TR at 592).

Accordingly, the ALJ committed no material error in posing the hypothetical to the vocational expert.

<div align="center">CONCLUSION</div>

After careful consideration of the record as a whole, the magistrate judge concludes that the Commissioner's decision is supported by substantial evidence and is free from material legal error. Accordingly, it is ordered that judgment be entered in favor of the Commissioner.

DATED: 10/3/08

_____
CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

**SOCIAL SECURITY ADMINISTRATION**
Office of Disability Adjudication and Review

12

DECISION

| IN THE CASE OF | CLAIM FOR |
|---|---|

Adrian Yazzie
(Claimant)

Supplemental Security Income

(Wage Earner)

(Social Security Number)

## JURISDICTION AND PROCEDURAL HISTORY

On February 28, 2003, the claimant protectively filed an application for supplemental security income, alleging disability beginning December 30, 1967. The claim was denied initially on July 11, 2003, and upon reconsideration on November 5, 2003. Thereafter, the claimant filed a timely written request for hearing on January 7, 2004 (20 CFR 416.1429 *et seq.*). On December 14, 2004, Administrative Law Judge Joseph D. Schloss dismissed the claimant's request for hearing as the claimant failed to attend the scheduled hearing and did not give a good reason for not appearing at the hearing. The claimant requested Appeals Council review of the dismissal, and on September 13, 2005, the Appeals Council granted the request for review, vacated the order of dismissal, and remanded the case for further proceedings. The case was transferred to the Long Beach hearing office as the claimant was scheduled to attend a substance abuse rehabilitation program in Long Beach. The case was then transferred back to the San Bernardino hearing office because there were no openings at the rehabilitation facility.

The claimant appeared and testified at a hearing held on May 7, 2007, in San Bernardino, CA. Joseph M. Mooney, an impartial vocational expert; and Isaac Molen, the claimant's case worker, also appeared and testified at the hearing. The claimant is represented by Bill Latour, an attorney.

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), I have considered the complete medical history consistent with 20 CFR 416.912(d).

See Next Page

**EXHIBIT**

 
After careful consideration of all the evidence, I conclude the claimant has not been under a disability within the meaning of the Social Security Act since February 28, 2003, the date the application was filed.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, I must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, I must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, I must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, I must consider all of the claimant's

See Next Page

**EXHIBIT**

 

Adrian Yazzie                                         Page 3 of 9 **14**

impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, I must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), I must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, I make the following findings:

**1. The claimant asserted he has not engaged in substantial gainful activity since December 30, 1967, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).**

The claimant has been working 20 hours a week for the past year washing RV's. The job was obtained through the Inland Regional Center. The claimant testified he has a job coach who takes him to the job and stays with him. I find that this work activity is not substantial gainful activity.

**2. The claimant has no functionally limiting physical impairment. The claimant has a severe mental impairment from mildly diminished cognitive function and ongoing alcohol abuse (20 CFR 416.920(c)).**

**3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

See Next Page



 

Adrian Yazzie

The claimant's mental impairment causes moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace. There are no episodes of decompensation of extended duration.

**4.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work at any exertional level.  The claimant's mental impairment leaves the claimant with the mental residual functional capacity to perform routine and repetitive, entry level, minimally stressful work requiring no contact with the general public and only superficial interpersonal contact with co-workers and supervisors.**

The testimony of the claimant and Isaac Molen, the Inland Regional Center case manager, establish no different conclusions. The claimant asserted he has been working for the past year, 20 hours a week, washing RV's. His job was obtained through the Inland Regional Center. He has a job coach who takes him to the job and stays with him. He complained of poor memory, difficulty understanding, and diminished confidence. He said he becomes angry and depressed, but he has had no suicidal ideation. He was last arrested in 2006. He is currently on probation, and he is a registered sex offender.

Isaac Molen, the case manager, testified the claimant has been a client of Inland Regional Center for years. Mr. Molen sees the claimant once or twice a quarter, and he infrequently talks to him on the telephone. The claimant has a diagnosis of mild mental retardation. He has haphazard job attendance and is often AWOL from the group home where he lives. Mr. Molen stated if the claimant could, he would spend his biweekly paycheck on alcohol. I agree with Mr. Molen's testimony regarding the claimant's alcohol abuse.

In 1996, the claimant reportedly fractured his hip and pelvis when he was struck by a train. The claimant has an uneven gait at times (Exhibit B15F, p. 37), but there is no evidence he has significant residuals from the accident. The claimant was seen on one occasion in July 2005 for complaints of back pain and diagnosed with back spasm. The treating source noted the claimant had lumbar spasms, but no neurological deficits, and restricted the claimant to lifting no more than 10 pounds for one week until a follow-up visit (Exhibit B22F, p. 2). However, there is no evidence the claimant returned for follow-up care, or that the claimant has chronic low back pain. There is no evidence the claimant has permanent weight restrictions for lifting and carrying, and there is no evidence the claimant has a serious physical impairment.

On June 26, 2006, Dr. Nicholas Lin conducted a consultative internal medicine examination of the claimant, whose chief complaints were mental retardation, a history of depression, a history of alcohol abuse, hearing loss, and status post surgery for a pelvic injury (Exhibit B19F, p. 1). During the examination, the claimant exhibited no hearing deficits and heard Dr. Lin talking from across the examination room (Exhibit B19F, p. 3). The claimant's heart and lung sounds were normal. Range of motion of the back was reduced, but this is a subjective test and within the control of the person being examined. The claimant's gait was normal; he moved on and on the examining table without difficulty, and he could stand on his heels and toes. Motor strength, sensation, and reflexes were all normal (Exhibit B19F, pp. 4-5). Dr. Lin assessed the claimant

See Next Page





with a medium exertional capacity (Exhibit B19F, p. 5), but in view of the largely benign findings, I do not find evidence that the claimant has any physical limitations.

Regarding the claimant's mental impairments, the record supports a finding that the claimant's mental impairments are exacerbated by alcohol abuse. School records reveal that in 1981, a school psychologist evaluated the claimant when the claimant was attending 8th grade and receiving special education services for mathematics (Exhibit B2F). The psychologist concluded that the WISC-IV test results regarding I.Q. scores, which were well below average, did not reflect the claimant's true intellectual potential. The psychologist reported that the other test results, including the Detroit Tests of Learning Aptitude and Peabody Picture Vocabulary Tests were average and probably reflected the claimant's true intellectual potential (Exhibit B2F, p. 6). Records from Sherman Indian High School also reflect that the claimant's grades were all average or above during the 10th grade, except for his health class (Exhibit 3F, p. 9). The claimant's grades dropped to C's, D's, and F's during the 11th grade, which is when he dropped out of high school. However, the teacher's comments show that the claimant was not performing to the best of his ability since they remarked the claimant "could do better," "missed assignments," "poor attitude, needs to complete more work" (Exhibit B1F, p. 7). The record supports a finding that the claimant's grades plummeted when the claimant began abusing alcohol and marijuana. The claimant has admitted that during high school, he was drinking to excess and smoking marijuana. The claimant had blackouts, hangovers, and was late to school (Exhibit B15F, p. 33).

The claimant was reportedly intoxicated when he fractured his hip and pelvis (Exhibit B15F, p. 37). On another occasion, the claimant was treated in the emergency after he was found passed out at a bus stop (Exhibit 3F, p. 2). Laboratory testing revealed a blood alcohol level of .29 (Exhibit B3F, p. 1). In March 2000, the claimant admitted to alcohol abuse and drug abuse, including experimentation with speed (Exhibit B5F, p. 4). On yet another occasion, the claimant received emergency room treatment for facial contusions sustained when the claimant was reportedly attacked by two other people after he was walking home after drinking (Exhibit B5F, p. 7). In April 2003, the claimant's mother reported the claimant was an alcoholic and had abused alcohol for five years. She said he was incarcerated during 2002 for five-six months because of public intoxication (Exhibit B12E, p. 2)

Records from Inland Counties Regional Center show that the claimant has received their services since at least April 2001, based on a diagnosis of mild mental retardation (Exhibit B15F, pp. 23, 37-42). Despite completion of alcohol rehabilitation on several occasions, the claimant has had ongoing problems with alcohol and several arrests for public intoxication (Exhibit B15F, pp. 15, 26, 33, 41). The claimant reportedly leaves the group home for several days without notifying anyone of his whereabouts, becomes intoxicated, and returns only when his money runs out (Exhibit B20F, pp. 27, 40, 41, 46). While being seen for an isolated episode of lightheadedness in December 2003, the claimant admitted to alcohol and speed abuse (Exhibit B22F, p. 7).

Treatment notes from James G. Barker, Ph.D., reflect that Dr. Barker's goals were to encourage the claimant to maintain sobriety. Dr. Barker indicated that the claimant's alcohol abuse increased the risk of sexual assault by the claimant, who inappropriately touched a female client during group therapy, and who has a history of molesting a family member (Exhibit B4F, p. 1;

See Next Page

EXHIBIT

Adrian Yazzie

Page 6 of 9
**17**

Exhibit B15F, pp. 32-36). The claimant admitted the molestation episodes occurred when he had been drinking (Exhibit B15F, p. 32). On April 18, 2002, the claimant was convicted of misdemeanor sexual battery after he inappropriately touched a female in a park (Exhibit B15F, p. 20). Dr. Baker's notes reflect that the claimant's sexual misbehavior and alcohol dependence were interrelated (Exhibit B15F, p. 20), and the claimant's alcohol abuse also exacerbated the claimant's violence tendencies (Exhibit B15F, p. 3).

Dr. Reynaldo Abejuela conducted a consultative psychiatric examination of the claimant on June 24, 2003 (Exhibit B11F). The claimant said he had completed an alcohol rehabilitation program, but he said he continued to drink beer because it helped him sleep (Exhibit B11F, p. 1). During the examination, the claimant's attention, orientation, memory, ability to interpret proverbs, judgment, and calculation were all intact. Dr. Abejuela diagnosed an alcohol-induced mood disorder and a history of alcohol abuse (Exhibit B11F, pp. 3-4) and concluded that the claimant had no severe restriction in any area of work-related activities (Exhibit B11F, pp. 3-5).

On June 19, 2006, Dr. Linda Smith conducted a consultative psychiatric examination of the claimant (Exhibit B18F) and reported that the claimant was an unreliable historian and gave inconsistent answers during the examination. The claimant also claimed to have a poor memory, but Dr. Smith did not observe any evidence of a memory impairment (Exhibit B18F, p. 2). The claimant said he was taking Paxil but quit because he did not think it helped him, and he was not as depressed as he used to be (Exhibit B18F, p. 4). During the interview process, the claimant was vague regarding his alcohol consumption, and he denied ever using amphetamine or speed (Exhibit B18F, p. 5). The mental status examination reflected normal thought processes, thought content and speech, and mild depression. The claimant completed a four-page questionnaire and told Dr. Smith what day of the week it was but then claimed he did not know the date, which Dr. Smith attributed to poor effort (Exhibit B18F, p. 7). During memory testing, the claimant was not motivated. He exhibited a good fund of knowledge, but then gave poor effort while performing calculations. Insight and judgment appeared fair. Dr. Smith diagnosed alcohol abuse and a mood disorder not otherwise specified (Exhibit B18F, pp. 7-8). Dr. Smith also assessed a GAF of 62 (Exhibit B18F, p. 8). According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (4th ed., 1994), a GAF score between 61-70 indicates some mild symptoms, such as depressed mood and mild insomnia, or some difficulty in social occupational, or school function, but generally functioning pretty well, with meaningful interpersonal relationships. Dr. Smith concluded that if the claimant remained sober, she saw no reason why he could not perform simple repetitive tasks. She also thought that any mood disorder the claimant might have was due to alcohol abuse, and that the claimant would continue to improve if he abstained from alcohol and was medically compliant (Exhibit B18F, p. 9). Dr. Smith's opinion is supported by her examination; however, giving the claimant the benefit of the doubt, I am finding that the claimant's condition is severe, based on Dr. Taylor's examination.

On February 9, 2007, Dr. Clifford Taylor conducted a consultative psychological examination of the claimant (Exhibit B21F). The claimant admitted he drank two bottles of alcohol the week before the exam, but he denied any present or past use of drugs (Exhibit B21F, p. 3). Testing revealed that the claimant's intellectual functioning was within the borderline range based on a Full Scale IQ of 75. Dr. Taylor thought the claimant's attention and concentration appeared to be below normal, and the claimant was distractible. Fund of knowledge and speech were

See Next Page



 

normal.  Delayed auditory memory was in the extreme low range, but long term memory was intact (Exhibit B21F, p. 3).  The claimant's Verbal IQ was 79, and his Performance IQ was 74 (Exhibit B21F, p. 4).  Dr. Taylor diagnosed alcohol dependence and sexual abuse as a child.  He also indicated the claimant had a GAF score of 60, which the <u>DSM-IV</u> interprets as having moderate symptoms or moderate difficulty in social, occupational, or school functioning. However, Dr. Taylor concluded the claimant was functioning well within the borderline range of intellectual functioning, based on the standardized tests, and also noted that it was unusual for the Inland Regional Center to accept a client that did not meet the criteria for mental retardation. Dr. Taylor stated that the claimant had mild impairments in his ability to do the following: understand, remember and carry out short, simple instructions; and understand, remember, and carry out detailed instructions. He also concluded the claimant had moderate impairments in his ability to do the following:  maintain attention, concentration, persistence, and pace; relate and interact appropriately with supervisors, co-workers, and the public; and adapt to day to day work activities including attendance and safety (Exhibit B21F, pp. 5-6, 8-9).  Dr. Taylor also reported the claimant's level of cognitive functioning was impacted due to alcohol dependence (Exhibit B21F, pp. 8-9).  I agree and adopt Dr. Taylor's conclusions.  Although the claimant has moderate impairment in some areas, it does not mean that he is totally precluded from all work activities. The claimant is fully capable of performing within the residual functional capacity found herein.

Apart from objective findings, there are substantial reasons pursuant to Social Security Ruling 96-7p to conclude that the claimant is able to engage in a wide range of basic work related activities.  The claimant has no significant physical impairment, and the claimant's mental impairment is impacted by his alcohol abuse.  Disability benefits are not payable to those who have a significant drug and/or alcohol impairment which is a contributing factor material to a finding of disability.  Moreover, the record shows the claimant is able to engage in a wide range of activities of daily living.  During Dr. Abejuela's examination, the claimant said he took care of his personal hygiene and grooming, did house cleaning, and watched sports (Exhibit B11F, p. 3).  Other show that the claimant completes his self-care.  He does his laundry, cooks, makes his bed, washes dishes and does yard work (Exhibit B15F, p. 37).  During the 2006 examination with Dr. Smith, the claimant said he cleans his room, makes food, dresses and bathes himself, goes to the mall on group outings, and watches television.  The claimant can become angry towards others (Exhibit B20F, p. 13), but he reported he gets along well with others (Exhibit B18F, p. 6).  The notes reflect that the claimant's use of alcohol and drug worsen the claimant's aggressive behavior (Exhibit B20F, p. 8).  There is no evidence the claimant cannot control his temper if he so desires and when he is sober.  He uses public transportation and can make purchases and pay with the correct money (Exhibit B15F, p. 38).  The claimant currently works part-time, washing RV's.  The claimant is not a credible person, according to Dr. Smith, and he was vague when asked about his drinking and denied he used speed (Exhibit B18F, p. 5).  The claimant also denied current and past use of drugs to Dr. Taylor (Exhibit B21F, p. 3).  However, notes from a behavior consultant at SVS reveal the claimant continues to go AWOL from the group facility, and whenever he is in possession of money, he spends it on drugs and alcohol (Exhibit B20F, p. 10).  The consultant also noted that the claimant was non-compliant with the terms of his probation and continued to leave the facility without permission and use alcohol and/or drugs (Exhibit B20F, p. 2).  All of the aforementioned factors are inconsistent with the presence of an incapacitating or debilitating medical condition.

See Next Page





Adrian Yazzie (~~SSN~~)

Page 8 of 9

19

As for the opinion evidence, the State Agency review psychiatrists concluded that the claimant could perform simple repetitive tasks in a non-public environment (Exhibits B13F, B14F, B16F). I agree and adopt their conclusions, which are consistent with the substantial evidence of record.

Dr. Bob Chang, a psychologist with the Inland Regional Center, reported that the claimant is mildly mentally retarded, and the claimant has difficulty managing his money due to alcohol abuse (Exhibit B10F, p. 2). Dr. M. Eliana Lois also reported the claimant was eligible for services from the Regional Center based on the diagnosis of mild mental retardation, and the claimant had mild hearing loss and depression (Exhibit B15F, p. 3). The claimant does have cognitive deficits; however, I do not find that the claimant is developmentally disabled within the parameters of Listing 12.05 (mental retardation), based on the examinations by Dr. Abejuela, Dr. Smith, and Dr. Taylor.

I have also considered the Third Party Information report submitted by Victoria Webster, the claimant's mother (Exhibit B11E). However, I do not give significant weight to Ms. Webster's opinion because when she completed this form, she only saw the claimant three times a year (Exhibit B11E, p. 4). Moreover, the information she provided is inconsistent with the records. For example, Ms. Webster stated the claimant had concentration deficits which precluded him from finishing school or keeping a job (Exhibit B11E, p. 5). The record indicates, however, that the claimant was not sufficiently motivated to finish school, and that he could have exerted more effort (Exhibit B1F, p. 7). She reported that the claimant socialized with the wrong people, who led him to his current alcohol problems (Exhibit B11E, p. 5); however, the record indicates the claimant seeks alcohol and perhaps drugs on his own and is not influenced by others.

**5. The claimant has no past relevant work (20 CFR 416.965).**

**6. The claimant was born on December 30, 1967 and was 35 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).**

**7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).**

**8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

**9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).**

In determining whether a successful adjustment to other work can be made, I must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has

See Next Page



 Adrian Yazzie 

nonexertional limitations, the medical-vocational rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision making (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 204.00. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled medium occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of thousands of jobs such as packager, cleaner, general laborer, and warehouse worker, which are all learnable by less than 30 days of on the job training and demonstration.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**10. The claimant has not been under a disability, as defined in the Social Security Act, since February 28, 2003, the date the application was filed (20 CFR 416.920(g)).**

### DECISION

Based on the application for supplemental security income protectively filed on February 28, 2003, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

F. Keith Varni
Administrative Law Judge
**3 1 MAY 2007**
Date

KF


EXHIBIT